# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-2052

_____

Jane Doe, a minor by and through her mother and next friend Susan Doe

*Plaintiff - Appellant*

v.

Andrew Gay, individually and in his capacity as an officer or agent of the
Marianna Police Department

*Defendant*

City of Marianna, Arkansas

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Helena

_____

Submitted: January 15, 2013
Filed: June 20, 2013 (Corrected: June 24, 2013)

_____

Before BYE, MELLOY, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Jane Doe appeals the district court's grant of summary judgment to the City of Marianna ("Marianna") on her claims under 42 U.S.C. § 1983.  Doe was sexually assaulted by Andrew Gay, a Marianna police officer, on August 25, 2008.  Gay was charged with first degree sexual assault and subsequently terminated from Marianna's police force.  Because Doe has raised genuine issues of material fact, we vacate the grant of summary judgment to Marianna.

I.

We must view the evidence in the light most favorable to Doe and draw all reasonable inferences in Doe's favor.  Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir. 2011).

Vincent Bell became Marianna's Police Chief in mid-July 2008.  At the time he was appointed Police Chief, the Marianna Police Department ("the Department") employed approximately twelve officers.  As Police Chief, Bell was in charge of setting the Department's policies and disciplining officers, although Bell conferred with Marianna's mayor before Bell terminated any officers.  When Bell began work as Police Chief, he believed that there were problems with "professionalism" among Marianna's officers and that the community "just didn't trust the police."  In his opinion, at the time he took over the Department, the culture of the Department was permissive.  Specifically, Bell testified, "if you were likeable, then, you know, you got away with certain things," and the mayor showed favoritism to some officers; officers believed they could commit misconduct and avoid discipline.

Other officers and dispatchers corroborated Bell's description of lax discipline in the Department.  One officer testified that, at the time of Bell's appointment, some officers would ask city council members or the mayor to override any discipline supervisory officers handed down.  The same officer testified that even when an officer's suspension remained on the books, no one forced the officer to actually serve

the suspension—supervisors allowed the officer to continue working and earning pay. A third officer also described a culture of favoritism in the Department prior to Bell's appointment. Finally, a dispatcher testified that Marianna officers insulated each other from complaints of misconduct. She reported an incident in which an officer responded to a domestic disturbance call but returned to the station without an arrestee. When she asked why the responding officer had not made an arrest, the officer answered, "because [the suspect] is a police officer." She testified that the practice of protecting other officers was shared by all the officers in the Department.

On July 25, 2008, Bell hired 21-year-old Andrew Gay as a Marianna police officer. Prior to July 25, 2008, Gay was a Marianna police dispatcher. From the time Bell hired Gay through the time Gay was terminated, Bell remained Police Chief. New Marianna officers generally entered a training period of six to twelve weeks following hire, and Gay began training soon after Bell hired him. Gay's training consisted of ride-alongs with fully trained officers on patrol. He did not receive weapons training or legal training. Outside of his ride-alongs, he did not receive training on arrest or traffic stop procedures.[1] Gay testified he gained little knowledge of traffic laws or any other laws during the ride-alongs. Arkansas law required new officers to undergo training through the state's police academy within twelve months after hire; however, Gay did not complete or begin the state program. Bell admitted there were no written procedures detailing what new trainees were to learn but testified he had given his officers training instructions. However, one officer who assisted in training Gay testified that he did not remember receiving any instructions from Bell regarding what to teach Gay during training.

---

[1] Gay accompanied Bell to one police seminar at some point between Gay's hire and August 25, 2008. Gay testified he did not know the subject of the seminar. He testified that the material was over his head and that he did not understand any of it.

After approximately one week of training, the Department issued Gay a firearm and a police uniform. According to the Department's policies, officers in training were not allowed to drive a police car or patrol alone. However, Gay's supervisors expressly permitted him to drive police cars alone and to patrol alone while he was still in training. Though Gay could not recall precisely, he estimated he was first allowed to drive a police car alone and make traffic stops alone one to two weeks into training. Gay remembered making approximately four traffic stops on his own. Even before his supervisors allowed him to actually make stops, he testified, they permitted him to patrol alone, conduct police escorts alone, and assist in domestic disturbance calls. Gay believed Bell had given permission for him to patrol alone, and Bell had been present at least once when Gay left the police station in a patrol car by himself.

On August 25, 2008, Gay—still in training and thus not qualified to patrol alone—was on patrol duty. During his day shift, he rode with another officer. His shift ended at 7:00 PM. Instead of going off duty at 7:00 PM, he patrolled alone, driving in a police vehicle. He continued to check in over the police radio per Department policy, although he failed to report his mileage as Department policy also required. He testified he had never heard of an officer being disciplined for failing to report mileage. Each on-duty officer carried a radio, so all on-duty officers, including the supervising shift commander, had the ability to hear other officers' check-ins.

At some point after 7:00 PM, while still patrolling, he met Doe and invited her into the police car. Contrary to Department policy, Gay allowed Doe to sit in the front seat of the car. Gay then sexually assaulted Doe. Although Doe was fourteen years old at the time Gay assaulted her, Gay later claimed he believed Doe was sixteen or seventeen years old. Gay also testified that at the time he assaulted Doe, he did not know it was illegal for a police officer to have sexual contact with a

-4-

sixteen- or seventeen-year-old.[2] Based on his observations of other officers' on-duty behavior and the lack of discipline for misconduct, he testified, he did not believe he would be disciplined for picking up a girl and driving around with her. Specifically, Gay testified, "By them not being reprimanded for it, I didn't think that, you know, wouldn't anything [sic] come of this."

Some time after Gay picked up Doe, Doe's mother arrived at the Marianna police station and alleged Gay was driving around with her underage daughter. A dispatcher summoned Gay to the police station. Over the course of that night and the next day, a Marianna officer took statements from Gay, Doe, and Doe's mother. The next day, August 26, the state police took over Doe's case and Bell placed Gay on administrative leave. When the state police completed their investigation, Gay was charged with sexual assault in the first degree and terminated from Marianna's police force. Gay testified he submitted a letter of resignation to Bell because he thought it would be better for him to resign than to be fired, but he was not sure whether his resignation had been accepted.

---

[2] Even if Doe had been seventeen on August 25, 2008, Gay's actions would still have constituted a crime. Gay could have been charged with second-degree sexual assault because Gay was a law enforcement official and Doe was a minor. See Ark. Code Ann. § 5-14-125(a)(4)(A)(ii).

Although Gay disputed the details of the assault, and although the parties to this appeal dispute whether Doe physically resisted, Marianna agrees with Doe that the assault occurred. In any case, the victim's consent is not a defense to first-degree sexual assault. See Ark. Code Ann. § 5-14-124(b). As we discuss later, our circuit considers first-degree sexual assault a violent crime. See Parrish v. Luckie, 963 F.2d 201, 205–06 (8th Cir. 1992).

Doe's mother filed a civil suit on Doe's behalf against Gay and Marianna under 42 U.S.C. § 1983;[3] when Doe reached the age of eighteen, she refiled the suit on her own behalf. Doe alleged Marianna failed in its duty to supervise, investigate, and discipline its police officers. She alleged these failures constituted a policy, practice, or custom "which created an atmosphere where unconstitutional behavior was accepted, approved, and ratified in reckless disregard and deliberate indifference to the welfare of the public" leading to Gay's assault on her.

Through the course of discovery, including numerous depositions, Doe uncovered additional incidents of serious misconduct by Marianna police officers beginning in 2005. We list the most relevant incidents here:[4]

- Two officers entered a private citizen's business. With only the citizen and officers inside, one of the officers unholstered his gun and threatened to murder the citizen. The other officer did not attempt to stop the threat and did not report the threat. The citizen filed a civil suit. One of the officers involved later resigned. The

[3] In addition to § 1983 claims, Doe made claims under Arkansas state law. The district court granted summary judgment to Marianna on all state claims. Although Doe references the Arkansas Civil Rights Act on the first page of her brief to our court, no Arkansas law appears in her Table of Authorities. Thus, we assume she limits her appeal to her federal claims. Of the federal claims she raised in her Complaint, she abandoned a negligent hiring claim in the district court and appears to have also abandoned a failure to train claim on appeal; thus, only her claims based on failure to supervise, investigate, and discipline remain. Gay is not a party to this appeal.

[4] The record contains evidence of additional nonviolent incidents of misconduct we do not list. Further, the records provided by Marianna do not appear well-organized or comprehensive. In particular, the records provided by Marianna do not provide dates for several of the incidents. However, testimony by officers suggests the undated incidents took place either during Bell's tenure as Police Chief or within several years before Bell's appointment.

other officer was not disciplined. There is no record of an investigation by the Department.

- In the presence of a second officer, an officer threatened to kill a citizen. There is no record of an investigation by the Department and no indication either officer faced discipline. The officer who made the threat resigned several months later.

- Two officers shot and killed an unarmed suspect. Although the suspect's family filed a lawsuit, there is no record of an investigation by the Department or discipline of the officers.

- A police dispatcher complained an officer grabbed her buttocks while on duty. Supervisors instructed the officer to have no contact with the dispatcher. After contravening the instruction and attempting to interact with the dispatcher, the officer resigned. There is no record of an investigation by the Department.

- A police dispatcher claimed a police corporal reported her for unprofessional conduct and poor performance because she refused to sleep with him. There is no record of an investigation by the Department and no indication the officer faced discipline.

- During an argument at the police station, the Police Chief [5] drew his gun and pointed it at another officer. There is no record of an investigation by the Department and no indication the officer or the Police Chief faced discipline.

- An officer wrapped handcuffs around his hand and punched a prisoner who was confined in a cell at the police station. Bell attempted to terminate the officer but, Bell testified, "[a]gain, there was interference [from Marianna officials] and nothing was done." The officer was not disciplined and there is no record of an investigation by the Department.

---

[5] The Police Chief involved was not Bell.

• An officer was accused of domestic assault. Bell wanted to terminate the officer; Marianna officials became involved. Bell failed to follow up with the officials and the officer was not disciplined. No record of the incident appears in the officer's personnel file.[6] Bell testified he wanted to terminate the officer because an officer who commits domestic assault poses a danger to the public. There is no record of an investigation by the Department.

• An officer was found socializing at a house while on duty. A communication to the officer contained in the record shows the officer was suspended for three days. However, the officer's suspension was lifted after he appealed to the mayor. There is no record of an investigation by the Department.

• While Gay was on a training ride-along with another officer, the officer stopped at a friend's house to socialize. Alcohol was available at the house, although Gay was not sure whether the officer consumed any alcohol. Neither Gay nor the other officer was disciplined. There is no record of an investigation by the Department.

• An officer threatened to shoot another officer in the face and talked openly about wanting to kill her. Bell testified he investigated the threats, but there is no record of an investigation by the Department and no indication the officer was disciplined. The officer later resigned.

• Two officers responded to a call by a citizen whose car was stuck in a ditch. After pulling the car out, the officers extorted money from the citizen. There is no record of an investigation by the Department

---

[6] The district court held that Bell's testimony regarding what the officer said—Bell thought but was not sure the officer had admitted committing the assault—was hearsay. However, at the very least, Bell's recommendation that the officer be terminated is evidence of Bell's subjective belief that the assault occurred, and Bell's testimony regarding the action or inaction of Marianna officials is admissible and relevant to Doe's claim.

and no indication either officer faced discipline. The officers later resigned.

- When Gay was a dispatcher, he was accused of domestic assault. There is no record of an investigation by the Department and Gay was not disciplined.

- Bell received reports that officers were extorting money from local businesses. Bell testified he ordered the officers to pay back the money. There is no record of an investigation by the Department and the officers were not disciplined.

Despite the serious and violent nature of most of these incidents, for the majority there is no evidence of an investigation by the Department and no indication the officers were disciplined. Although some of the officers involved in misconduct later resigned, the record does not indicate whether these resignations stemmed from the misconduct.[7] Bell testified that if no disciplinary action was taken in response to an incident, no documentation of the incident was placed in the officer's personnel file. Bell also testified he sometimes wrote reports of incidents and saved them to his

---

[7] The record contains several forms noting "change-in-status" of certain officers and indicating certain officers had resigned. However, these forms do not indicate the reasons for the resignations, and they are not attached to any other documents indicating the resignations were the result of misconduct or of an investigation as opposed to personal career decisions. The forms contain options from which the writer can choose to indicate the reason for the change in status. Those options include resignation, dismissal, or "separation." "Separation" is followed by four sub-options. On two of the forms, the writers indicated the officers were "separated" for violations of Arkansas state law or Department policy; however, the writers hand-wrote "allowed to resign" on the forms. Additionally, the record contains a one-sentence memo printed on Department letterhead. In full, the memo names two officers and states they were "terminated due to civil lawsuits against them." The statement is not dated, not signed, and not attached to any document describing the nature of the lawsuits or the incident(s) leading to the lawsuits.

computer's hard drive without placing them in officers' files or official records.[9] Finally, other than one officer's recollection that the keys to police vehicles were moved to a different location after Gay was terminated, the record does not indicate the Department responded to any of the incidents above by making changes to prevent future misconduct.[10]

Bell claimed he did not know Gay had been patrolling alone until after Gay assaulted Doe, and other supervisors also claimed they did not know or they believed Bell had given permission for Gay to patrol alone even though Gay was not qualified to patrol alone. However, as a police dispatcher testified, because supervisors on duty carry radios over which they can hear all reports and check-ins from officers on duty, it is reasonable to infer that Gay's supervisors, including Bell, would have heard Gay's radio check-ins when he was patrolling alone. Indeed, the dispatcher on duty the evening of August 25, 2008 recalled she had been surprised to hear Gay's solo check-ins because she knew he was still in training.

---

[9] The current Police Chief, Martin Wilson, did not know of those additional reports, and Wilson did not think anyone had looked for records on Bell's computer. To the extent Bell's additional records exist and, further, to the extent those records could demonstrate the Department investigated misconduct or disciplined officers after the incidents described above, those documents are not contained in the record before us, and Marianna has not alleged those documents will provide additional relevant evidence.

[10] The incidents we list took place between 2005 and 2010. Specifically, to the best of our understanding of the record, two of the incidents for which we have specific dates took place after Gay assaulted Doe. Although neither party raises the issue, the district court noted Doe had relied in part on evidence of misconduct occurring after Gay assaulted her. We need not determine whether Doe may use post-event evidence to prove a municipal custom of deliberate indifference to constitutional violations because we would vacate the grant of summary judgment to Marianna even without relying on the two incidents of misconduct which occurred after Gay's assault on Doe and without relying on Bell's handling of Gay's assault on Doe.

-10-

Based on inquiries Bell made after Gay assaulted Doe, Bell believed the shift commanders had improperly permitted Gay to patrol alone. Bell testified allowing Gay to patrol alone created a serious danger to the public. However, Bell admitted he did not discipline the shift commanders for allowing Gay to patrol alone. In fact, no officers other than Gay were disciplined as a result of Doe's assault. Bell testified he believed Marianna and the Department had not made any mistakes in hiring, training, or disciplining Gay, but that Marianna had made mistakes in supervising Gay.

Following discovery, Marianna moved for summary judgment. In its Order, the district court assumed only prior incidents of sexual assault by Marianna officers could constitute "past similar misconduct" relevant to Doe's claim. The district court concluded only one of the past incidents of misconduct—the dispatcher's complaint that an officer had grabbed her buttocks—could even arguably constitute sexual assault. Thus, the district court reasoned, Doe could not establish a pattern of past similar misconduct upon which a reasonable jury could find Marianna liable for Doe's injuries. The district court therefore granted summary judgment to Marianna. Doe now appeals. On appeal, Doe argues that whether the Department had a custom of failing to supervise, discipline, and investigate its officers is a genuine question of material fact and that the district court failed to view the evidence in the light most favorable to her.

II.

We review the district court's grant of summary judgment de novo. Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir. 2011). "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." Id. (quoting Rau v. Roberts, 640 F.3d 324, 327 (8th Cir. 2011)). "The court should deny summary judgment if there is sufficient

evidence for a jury to return a verdict for the non-moving party." Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 911 (8th Cir. 2011).

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a custom or usage with the force of law.'" Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998) (quoting Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691 (1978) (internal quotation marks omitted)). "To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." Parrish, 963 F.2d at 204. A plaintiff must establish (1) "a continuing, widespread, persistent pattern of unconstitutional misconduct" by the municipality's employees, (2) to which policymaking officials were deliberately indifferent or which policymaking officials tacitly authorized after notice to the officials of that misconduct, and (3) that custom of deliberate indifference or tacit authorization was a "moving force behind the constitutional violation." Thelma D. v. Bd. of Educ. of St. Louis, 934 F.2d 929, 932–33 (8th Cir. 1991) (quoting Jane Doe "A" v. Special Sch. Dist. of St. Louis, 901 F.2d 642, 646 (8th Cir. 1990)). A city will be liable "only where a city's inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the city's 'policy.'" Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 392 (8th Cir. 2007).

Thus, defining the scope of relevant past misconduct is an important part of our analysis and depends on the facts surrounding the alleged constitutional violation. Marianna argues only prior sexual assaults by Marianna officers are relevant to Doe's claim. But Marianna's argument defines the category of relevant conduct too narrowly. Certainly, not all past incidents of misconduct are relevant. However, in

this case, our precedent dictates that the scope of misconduct relevant to Doe's claim must include violent misconduct, not merely the subcategory of sexual assault.

We have specifically held the crime of first-degree sexual assault "is, first and foremost, a crime of violence." Parrish, 963 F.2d at 205–06 (analyzing Arkansas law). In Parrish, the plaintiff sought to hold a city liable for a police officer's sexual assault. Id. at 203. The defendant city argued the district court erred in allowing the plaintiff to introduce past incidents of violent misconduct by the city police officer. Id. at 205. We held past incidents of violent misconduct were equally relevant to the plaintiff's claim:

> [T]he reports of violent behavior are relevant to show that Chief Bruce had knowledge of Luckie's propensity toward violence. For instance, if Luckie had locked Parrish in the back of his patrol car and beat her up instead of sexual assaulting her, the City could not have raised this claim. The City's argument attempts to pigeonhole Luckie's various assaults as distinct and unrelated crimes. According to this argument, if a man whips his child with an extension cord, then dons his police uniform and beats up a prisoner, then locks a female prisoner in his squad car and forces her to perform oral sex on him, the acts are unrelated. It is clear, however, all of these acts constitute crimes of violence.

Id. Similarly, in Andrews v. Fowler we affirmed summary judgment for a municipality after the plaintiff was sexually assaulted by one of the municipality's police officers. 98 F.3d 1069 (8th Cir. 1996). We held the municipality was not liable because "there [was] no evidence that the city ever had received, or had been deliberately indifferent to, complaints of *violence or sexual assault*." Id. at 1076 (emphasis added). Under our caselaw, then, Gay's assault on Doe constituted a crime of violence, and Doe may introduce not only past incidents of sexual misconduct but also past incidents of violent misconduct by Marianna police officers to establish a pattern of deliberate indifference.

Unlike the Andrews plaintiff, Doe presented evidence showing the Department received numerous past complaints of officer violence. Viewing the evidence in the light most favorable to Doe and making all reasonable inferences, see Rynders, 650 F.3d at 1194, a reasonable jury could conclude that the Marianna Police Department was deliberately indifferent to those past incidents based on the Department's failure to investigate those incidents, the lack of discipline or termination of officers following those incidents, and the intervention of Marianna officials to stop the termination or punishment of officers accused of violent misconduct. Moreover, the evidence that supervisors (including Bell) permitted Gay's solo patrols creates at least a question of fact as to whether the Department practiced proper supervision. Bell even admitted the Department had failed to properly supervise Gay. A jury could reasonably infer, based on this evidence, that Marianna's custom of ignoring violent misconduct and failing to supervise or discipline officers was a moving force behind Gay's assault on Doe. Thus, we cannot say Marianna is entitled to judgment as a matter of law.

## III.

We vacate the grant of summary judgment to Marianna on Doe's claims under 42 U.S.C. § 1983 and remand for further proceedings consistent with this opinion.

_____